IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs April 3, 2018

## STATE OF TENNESSEE v. VICTOR MARTIN

**Appeal from the Criminal Court for Shelby County**
**No. 16-02262    Chris B. Craft, Judge**

_____

### No. W2017-01610-CCA-R3-CD

_____

The Defendant, Victor Martin, was convicted by a jury of especially aggravated robbery, attempted especially aggravated kidnapping, and setting fire to personal property, for which he received an effective sentence of forty-seven years' incarceration. On appeal, the Defendant argues (1) that the evidence was insufficient to support his convictions, contending that the State failed to establish use of deadly weapon, serious bodily injury, confinement that exceeded the accompanying felony, or his identity; (2) that the State committed a Ferguson violation by failing to preserve both a second photographic lineup and a single photograph shown to the victim on an iPad, thereby violating his due process rights requiring dismissal of the indictment or, alternatively, a limiting instruction; (3) that admission of the victim's medical records was improper given that the affidavit from the hospital's custodian of records was insufficient violating Tennessee Rule of Evidence 902(11); and (4) that the trial court erred by giving the jury an instruction on flight because it was not supported by the proof. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and J. ROSS DYER, JJ., joined.

Stephen C. Bush, District Public Defender; and Barry W. Kuhn (on appeal) and Jennifer H. Case (at trial), Assistant District Public Defenders, for the appellant, Victor Martin.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jose Francisco Leon and Abby Wallace, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION
## FACTUAL BACKGROUND

This case arises out of a November 4, 2015 robbery of the seventy-one-year-old victim John Blose ("the victim") at a Memphis gas station. Thereafter, the Shelby County Grand Jury returned a six-count indictment against the Defendant, charging him with especially aggravated robbery, especially aggravated kidnapping, employing a firearm during the commission of a dangerous felony, to wit: commission of or attempt to commit especially aggravated kidnapping, two counts of being a convicted felon in possession of a firearm, and setting fire to personal property. See Tenn. Code Ann. §§ 39-13-305, -13-403, -14-303, -17-1307, -17-1324.

A. Pretrial Motions. Prior to trial, the Defendant filed a motion for dismissal of the indictment pursuant to State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999). In discovery, the Defendant had been provided with one unlabeled photographic lineup and an advice form reflecting that the victim had picked the individual in position one as the perpetrator. In the Defendant's Ferguson motion, he claimed that the State failed to preserve a second photographic lineup labeled "A" in which the victim identified the individual in position "A3" as the perpetrator, as well as its corresponding "Advice to Witness Viewing Photographic Display" form. A hearing was held on the motion on February 24, 2017.[1]

At the hearing, Memphis Police Department ("MPD") Detective Billy Byrd testified that he assisted with a November 4, 2015 "carjacking case" that occurred around 7:00 a.m. at a Marathon gas station located on South Parkway. According to Detective Byrd, the Defendant was developed as a suspect later that day after they received a "Crime Stoppers tip." So, Detective Byrd prepared a photographic lineup that included the Defendant's picture and went to the hospital that evening to show the lineup to the victim. After Detective Byrd read the "Advice to Witness Viewing Photographic Display" form to the victim, Detective Byrd showed the photographic lineup to the victim, and the victim "picked out the [D]efendant" in position one. Detective Byrd testified that the victim identified the Defendant without any assistance. The victim then circled the photograph of the Defendant, wrote a comment at the bottom stating that he had identified the person who had robbed him, and signed and dated the photographic lineup at 9:37 p.m. The victim also completed the advice form, initialing that he made a positive identification and placing the number "1" in the blank for the position of the individual he recognized.

---

[1] This motion was heard in conjunction with the Defendant's motion to suppress the evidence found during the search of the apartment in which he was living.

Detective Byrd acknowledged that there was no alphabetical label on the lineup. Detective Byrd explained:

> Generally, the way we identify photographic lineups is by the alphabet, A, B, C, D, E, F, if there was just one created it would ha[ve] been generally for our office purposes one. Now if we'd of had to show multiple lineups we would [have] actually labeled them as A, B, C, D, and so forth to distinguish what was what. But this being the only one that was ever created, this was by default A.

According to Detective Byrd, he never prepared a second photographic lineup because there "was no need" due to the victim's positive identification. Detective Byrd asserted that the victim never identified anyone at position number three. In addition, Detective Byrd said that he turned over the lineup he prepared and the advice form completed by the victim to the lead investigator in this case.

After the victim was released from the hospital, he came to the police station and spoke with MPD Detective April Leatherwood on November 7, 2015. He was accompanied by his niece, Dawn Collier, who was present for the interview that began at 8:28 a.m. In the typed-written statement, the following questions were asked and answered:

> Q. Prior to giving this statement, on November 4, 2015[,] were you shown a form titled "Advice of Witness Viewing Photographic Display"?
> A. Yes.
> Q. Were you then shown a photographic lineup labeled "A"?
> A. Yes.
> Q. In regards to photographic lineup "A", did you identify anyone?
> A. Yes.
> Q. In regards to photographic lineup "A", what block was the suspect in?
> A. A3.
> Q. Are you positive the person you identified in the lineup is the same person responsible for robbing and assaulting you?
> A. Yes.

According to Detective Leatherwood, the victim looked at the statement after it was completed and his niece also reviewed it with him. The statement was signed at 9:21 a.m. by the victim, his niece, and Detective Leatherwood. There were no other officers present during the interview.

Detective Leatherwood was asked to explain the discrepancy between A3 in the statement and position one circled in the photographic lineup. She claimed that "it was a

typo." According to Detective Leatherwood, the November 4, 2015 advice form and photographic lineup were "in front" of the victim when she took his statement. Detective Leatherwood affirmed that she did not show the victim a second photographic lineup during the interview nor did she have the victim complete another advice form.

In addition, Detective Leatherwood maintained that the victim "had to respond A1 because he" was looking at the completed November 4, 2015 lineup when he answered the question. However, she did not distinctly remember the victim's answer. Detective Leatherwood agreed that she was "making every effort to type exactly what [the victim] said in response to [her] questions" because it was "important" to have an accurate statement. She did not believe that there were any other mistakes in the statement. When asked why she called the lineup "A," Detective Leatherwood explained that, although the lineup may not have been marked with an "A," it "was the very first lineup [the victim] saw, so it's A." She continued, "That's how we mark them A, B, C, D, or however many there are, so it's A."

The victim testified at the hearing and confirmed that he identified the individual in position one in the photographic lineup shown to him by Detective Byrd at the hospital. The victim averred that he was never presented with any other lineup. However, the victim testified that, about twenty minutes after completing the lineup, he was shown a single photograph on an iPad by a detective named "Mike." The victim maintained that he had already been presented with the photographic lineup and had identified the individual therein before being shown the photograph on the iPad.

MPD Detective Keith Phillips testified that he was the lead investigator in this case, and as part of those responsibilities, he collected the evidence and "put it in a packet[.]" Detective Phillips confirmed that there was only one photographic lineup and advice form used in the investigation. Detective Phillips also confirmed that an officer named Michael Gibbs was involved in this case.[2]

At the conclusion of the hearing, defense counsel amended the motion to include the iPad photograph. The defense then requested dismissal of the indictment or sanctions on the State due to their failure to preserve (1) the photographic lineup labeled "A" in which the victim identified the individual in "A3" and (2) the iPad photograph. The trial court took the matter under advisement and filed a written order on May 1, 2017, denying the Defendant's Ferguson motion.

In March 2017, the Defendant filed a motion to suppress the "out-of-court identification evidence" and any "in-court identification testimony," arguing that the victim's identification of the Defendant was unduly suggestive. A hearing was held on

---

[2] Detective Gibbs testified at this hearing but only in relation to the consent to search issue.

this motion on May 22, 2017.  At this hearing, Detectives Byrd, Gibbs, and Phillips and Officer Keyon Love testified.

Detective Byrd testified, after the victim identified the Defendant in the photographic lineup, he relayed this information to the other officers working on the case. Detective Byrd relayed that he was accompanied by Detective Phillips to the hospital that evening when he went to show the victim the photographic lineup and that they left the hospital together.  Detective Byrd confirmed that the photographic lineup he used was "A" although it was not labeled as such, explaining that "[t]he letter indication is for [official] purposes only."  Detective Byrd reiterated, that to his knowledge, no other lineup was ever created in this case "because [they] had [their] suspect."  Detective Byrd also stated that he was not issued an iPad and never showed the victim any picture on an iPad.  He was also not aware of any other officer ever showing the victim a photograph on the iPad.  Detective Byrd explained, "No officers in the [MPD] except for the higher rankings are issued iPads.  So no patrol level or investigative level officers that I'm aware of are issued iPads."

MPD Detective Michael Gibbs Jr. testified that he also assisted in the investigation.  According to Detective Gibbs, he and Detective Phillips went to the hospital on the morning of November 4, 2015, to meet with the victim shortly after the incident occurred.  Detective Gibbs said that the victim "wasn't really talking," so he photographed the victim's injuries and left.  According to Detective Gibbs, there were no photographs to show the victim at this time.  Detective Gibbs said that he returned to the hospital on November 6, 2015, to obtain a DNA sample from the victim.  By the time of his second visit, the Defendant had already been apprehended.  In addition, Detective Gibbs said that he was not issued an iPad, but he used a "PDA," which was a device he used to take reports, pictures, etc.  Detective Gibbs asserted that he did not have his PDA with him on either occasion he spoke to the victim at the hospital but admitted that he did have his cellphone.  Detective Gibbs maintained that he never showed the victim a photograph on any electronic device.  Furthermore, he could not recall anyone else, including the victim's niece, showing the victim a picture on any electronic device.

Detective Phillips also maintained that he did not show the victim any photograph on an iPad when he went with Detective Gibbs to visit in the hospital shortly after the incident took place.  Furthermore, he did not recall Detective Gibbs's doing anything of the sort. Detective Phillips confirmed that, at the time of the first visit, they did not have a suspect.  Detective Phillips additionally relayed that he accompanied Detective Byrd to the hospital that evening to show the victim the photographic lineup and stated that, after the victim's identification, they left the hospital together.  Detective Phillips confirmed that only one photographic lineup was prepared.

MPD Officer Keyon Love responded to the gas station and spoke with the victim in an effort to obtain information. After the victim was transported to the hospital by ambulance, Officer Love went to see him, and during this time, Detectives Phillips and Gibbs arrived. Officer Love said that he left prior to the detectives' leaving. Officer Love also testified that he never showed the victim a picture on any electronic device nor saw any other officers do so. Moreover, he likewise testified that they were "not issued iPads in patrol."

The Defendant's motion to suppress the identification evidence as unduly suggestive was denied. He proceeded to a jury trial held May 23rd through 26th of 2017.

B. Trial. At trial, the victim testified that, on November 4, 2015, he was travelling from his home in Pennsylvania to visit a relative in Arkansas and to attend his sister's wedding in Houston, Texas. While driving through Memphis in his Ford Explorer, he stopped at a Marathon gas station at 6:47 a.m.[3] to get some coffee and smoke a cigarette. Upon his arrival at the gas station, he engaged in casual conversation with the Defendant and another man, who were both standing outside in the parking lot. The men spoke "for a couple of minutes," and the victim asked for directions. The other man left, and the victim offered to buy the Defendant a cup of coffee. Although the Defendant declined the offer of coffee, the Defendant followed the victim inside the Marathon gas station at 6:51 a.m. Once inside, the victim went to the back of the gas station to get a cup of coffee, and the Defendant followed. They continued to converse. The victim waited at the door of until the victim paid for his coffee, and they exited the gas station together at 6:54 a.m.

Once outside, the two spoke a while longer and then said their goodbyes, and the victim headed towards his vehicle. The victim opened the door to his Explorer at 7:00 a.m. The victim testified that, upon returning to his automobile, he noticed that the Defendant was following him. According to the victim, the Defendant pointed a gun at him and ordered him to "scoot over." The Defendant, who was approximately "[a] foot and a half, two feet" away, exclaimed, "I'll shoot you. I mean it. I mean it." The victim said that he complied because he knew the Defendant "meant business."

The Defendant continued to "hold[] the gun on" the victim once they were inside the vehicle, and the Defendant "started to drive out" of the gas station at 7:01 a.m. When the Defendant took his hand off the wheel, the victim "grabbed the barrel of the gun," and a short struggle ensued. The Explorer stopped in the middle of the street. According to the victim, the Defendant "smashed [him] up side his face," "smashed [his] glasses and everything," and "drove" his hearing aid "into [his] ear[.]" The victim testified that

---

[3] The time on the surveillance video footage is provided in Eastern Time. However, the events of this case occurred in the Central Time Zone.

"blood just flew" and that he was "in physical pain" and "hurting bad." In addition, the victim said that his eye was cut open and that his "ear was all cut."

During the struggle, the victim managed to disarm the Defendant and throw the gun out of the passenger-side window of the vehicle. When the Defendant got out of the automobile to pick up the gun, the victim exited and went towards the gas station. The victim said that "[he] was taking blood so bad [he] knew [he] had to get out of there one way or the other." The victim further averred, "I knew I had to get some place to get the bleeding to stop because I take blood thinners from my doctor." As the victim headed towards the gas station, the Defendant drove away with his car at 7:03 a.m. Although the victim testified that he did not lose consciousness, he said that he was "really dazed" and almost passed out.

In addition, the victim testified that he did not want to leave the gas station with the Defendant and that he did not give the Defendant permission to take the vehicle or any of his property that was inside. The victim valued his Ford Explorer at $5,000.

The victim was asked to describe the Defendant's gun. He said, "It was a nickel plate and what I know about a revolver I would say it was a 7 or 9 millimeter nickel plate rifle gun. I don't know. I'm not familiar with handguns." The victim's typed-written statement was also introduced as an exhibit. In addition to the questions and answers set forth above, the statement provided that the Defendant was armed with a silver handgun during the robbery.

The victim suffered several lacerations to his face that required stitches and a fractured nose from the beating. The jury was able to view the photographs of the victim's injuries, which were admitted into evidence. The victim's medical records, which were also entered into evidence, indicated that the victim described his pain upon admission to the hospital as an eight out of ten, which was accompanied by the following explanation: "Pain began suddenly. Is continuous[ly] [c]omplain[ing] of pain in left side of forehead, left eye, left zygomatic area, right temporal area and right side of forehead[.]" The victim described his pain as "aching [and] throbbing" and was "[n]oted to be grimacing." In fact, the victim was unable to sign certain admission documents because of his medical condition. The victim's pain did not decrease until he was given morphine intravenously, and he was administered additional pain medication, such as hydromorphone and oxycodone, in the days that followed to manage his pain. The victim's medical records indicated that he reported "acute pain" on several occasions during his hospital stay. Moreover, his broken nose required surgery to repair. The victim was discharged from the hospital three days later on November 7, 2015.

Finally, the victim testified that, at times, he still suffered from his injuries having pain in his face where he was hit. When asked if his "hearing [had] been affected as a consequence of this," the victim replied that his hearing had "really changed."

The State showed surveillance video from the Marathon that captured multiple angles of the incident both inside and outside the gas station. The victim narrated the events for the jury as they were happening.

Officer Love testified at trial that he responded to the gas station at approximately 7:10 a.m. on the morning of November 4, 2015, after receiving a report of a carjacking. Upon arriving, Officer Love spoke with the victim who "had blood all over his face" and was "a little disheveled." Although the victim "was complaining of his injuries," the victim was able to provide Officer Love with a description of the assailant and the property inside his vehicle that was taken. Officer Love called for an ambulance.

MPD Officer David Payment testified that an arson call of a vehicle on fire was reported at approximately 7:15 a.m. and that he arrived on the scene of the fire at 7:50 a.m. Upon arrival, he "observed an SUV completely burnt beyond recognition in the backyard" of a house. Officer Payment stated that he smelled "an odor of some accelerant, like . . . kerosene or something[.]" Officer Payment photographed the vehicle, and the victim was able to identify the vehicle as his. Officer Payment testified that the distance between the gas station and the location of the burnt vehicle was less than two miles.

In addition, after the ambulance took the victim away, Officer Love was notified that a vehicle was on fire. Officer Love testified that he left the gas station and proceeded to travel "two blocks over" where he found that the victim's automobile had been set on fire.

Detective Gibbs testified at trial that the Defendant was developed as a suspect later that day after they received a "Crime Stoppers tip." Based upon the information provided in the tip, they were able to ascertain the Defendant's whereabouts, and the Defendant was arrested. When Detective Gibbs arrived at that location, the Defendant was already in custody. Detective Gibbs found out that the Defendant was staying in an apartment nearby with his girlfriend, who was present while the Defendant was being arrested. Detective Gibbs spoke with the girlfriend, who gave written consent to search the apartment at 7:35 p.m. Several bullets and the Defendant's mail were found inside a bedroom dresser. A bullet was also found under the bed. The Defendant's girlfriend said that the bullets did not belong to her. Outside, below a staircase "in front to the apartment," Detective Gibbs observed a number of items shoved underneath, including clothing the Defendant wore during the robbery and a number of items the victim had

been carrying in his vehicle. Detective Gibbs confirmed that they never found any firearm connected with the Defendant.

Moreover, Detective Gibbs stated that, between the apartment complex where the Defendant was staying and the backyard where the victim's vehicle was found, there was a "cut through the fence . . . behind the apartment complex." He also described that the locations of the gas station, the Defendant's arrest, the victim's burnt vehicle, and the Defendant's apartment were all "within walking distance" of one other.

The Defendant was photographed following his arrest. From these photographs, the victim identified the jacket that the Defendant was wearing at the time of arrest as belonging to him. The victim also identified the clothes found underneath the staircase as those the Defendant was wearing at the time of the robbery—a different jacket, a baseball hat, and a pair shoes. Subsequent forensic testing determined that the victim's blood was on the jacket the Defendant was wearing at the time of the offense and seen in the surveillance footage.

At trial, the victim testified that he was shown a photographic lineup and identified the Defendant therein. The paperwork accompanying his identification was entered into evidence. Detective Phillips testified again at trial that the victim was only shown one lineup, and Detective Leatherwood testified about the mistake in the victim's typed-written statement regarding the lineup. In addition, the victim was cross-examined about the discrepancies in his police statement. He was also questioned about the iPad photograph. Detective Gibbs testified that he was not in possession of an iPad when he visited the victim and that he never showed the victim any photograph on an iPad.

C. <u>Verdict, Sentence, and Appeal</u>. Following the conclusion of proof, the jury found the Defendant guilty as charged of especially aggravated robbery and setting fire to personal property and of the lesser-included offense of attempted especially aggravated kidnapping. Following a bifurcated proceeding, the Defendant was found not guilty of employing a firearm during the commission of a dangerous felony and of being a convicted felon in possession of a firearm. For his convictions, the Defendant received an effective sentence of forty-seven years' incarceration. The Defendant's timely motion for new trial was denied, and he now appeals to this court.

## ANALYSIS

On appeal, the Defendant argues (1) that the evidence was insufficient to support his convictions, contending that the State failed to establish use of deadly weapon, serious bodily injury, confinement that exceeded the accompanying felony, or his identity; (2) that the State committed a <u>Ferguson</u> violation by failing to preserve a second photographic lineup and a single photograph shown to the victim on an iPad, thereby

violating his due process rights requiring dismissal of the indictment or, alternatively, a limiting instruction; (3) that admission of the victim's medical records was improper given that the affidavit from the hospital's custodian of records was insufficient violating Tennessee Rule of Evidence 902(11); and (4) that the trial court erred by giving the jury an instruction on flight because it was not supported by the proof. We will address each in turn.

## I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions. Regarding the proof supporting his especially aggravated robbery conviction, the Defendant submits that the State failed to prove that the victim was assaulted with a deadly weapon or that the victim suffered serious bodily injury. The Defendant challenges the sufficiency of the convicting evidence supporting his attempted especially aggravated kidnapping conviction, maintaining that there was insufficient proof of serious bodily injury and of his "intent to substantially interfere with the liberty of [the victim] independent of an intent to take the [victim's] automobile." Finally, the Defendant argues that the evidence was insufficient to support his conviction for setting fire to personal property because the State failed to establish his identity as the perpetrator of that offense. The State counters that the evidence was sufficient in all respects.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Id.; see State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The standard of proof is the same whether the evidence is direct or circumstantial. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence." Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all

reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The Defendant was convicted of especially aggravated robbery, attempted especially aggravated kidnapping, and setting fire to personal property. Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear," accomplished with a deadly weapon, and where "the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401(a), -403(a). As relevant here, especially aggravated kidnapping occurs when a person "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty," and where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-302, -305(a)(1). In addition, criminal attempt requires proof that a person "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). "Conduct does not constitute a substantial step . . . unless the person's entire course of action is corroborative of the intent to commit the offense." Tenn. Code Ann. § 39-12-101(b). Finally, to obtain the Defendant's setting fire to personal property conviction, the State was required to prove that the Defendant knowingly damaged personal property by means of a fire or explosion and that he did so "[w]ithout the consent of all persons who ha[d] a possessory or proprietary interest therein[.]" Tenn. Code Ann. § 39-14-303(a)(1).

A. Deadly Weapon. First, the Defendant argues that "[a] reasonable juror could not be certain about what it was that [the victim] saw" because the victim stated that he was not familiar with handguns. The Defendant notes that the police did not find a weapon in the clothes underneath the staircase or during the search of the apartment. The State replies that there was sufficient proof as to the presence of a deadly weapon, noting that the jury accredited the victim's testimony that the Defendant had a gun at the time of the robbery despite the victim's confusion as to the caliber of the weapon.

The victim testified that, upon returning to his vehicle, he was followed by the Defendant, who pointed a gun at him and ordered him to "scoot over." According to the victim, the Defendant, who was approximately "[a] foot and a half, two feet" away, exclaimed, "I'll shoot you. I mean it. I mean it." The victim explained that the Defendant continued to "hold[] the gun on" him once they were inside the vehicle and that he began to drive away from the gas station. When the Defendant took his hand off the wheel, the victim grabbed the barrel of the gun, and after a short struggle, the victim managed to disarm the Defendant. After the victim threw the gun out the passenger-side window of the vehicle, the Defendant got out to pick up the gun, and the victim exited and went towards the gas station. The video corroborated the victim's story that

-11-

something was tossed out of the passenger-side window and that the Defendant went to retrieve it. In addition, the victim described the gun for the jury: "It was a nickel plate and what I know about a revolver I would say it was a 7 or 9 millimeter nickel plate rifle gun. I don't know. I'm not familiar with handguns."

Furthermore, several bullets, along with the Defendant's mail, were found inside a bedroom dresser in the apartment where the Defendant was staying. A bullet was also found under the bed. The Defendant's girlfriend said that the bullets did not belong to her. In addition, the victim said in his police statement that the Defendant was armed with a silver handgun. The victim never wavered that the Defendant employed a handgun during these events but merely stated that he was not an expert on handguns. The victim's familiarity with firearms, or lack thereof, does not entitle the Defendant to relief. Moreover, nothing requires that the weapon used during the robbery ever be recovered. Finally, although the jury returned not guilty verdicts on the firearm offenses, "inconsistent jury verdicts are not a basis for relief." State v. Davis, 466 S.W.3d 49, 77 (Tenn. 2015). There was sufficient evidence for a reasonable juror to conclude that the Defendant accomplished the robbery by using a deadly weapon.

B. Serious Bodily Injury. The Defendant claims that the proof was insufficient to show that the victim suffered serious bodily injury because "[n]one of the injuries described by [the victim] or those described in the medical records fit within" the statutory definition. The State responds that the evidence was sufficient for the jury to find serious bodily injury based upon a finding of extreme physical pain or protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty.

"Serious bodily injury" is

bodily injury that involves: (A) [a] substantial risk of death; (B) [p]rotracted unconsciousness; (C) [e]xtreme physical pain; (D) [p]rotracted or obvious disfigurement; (E) [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty; or (F) [a] broken bone of a child who is twelve (12) years of age or less[.]

Tenn. Code Ann. § 39-11-106(34). "Bodily injury" is defined to include "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2). This court has stated the following about the term "serious bodily injury" in the context of assault:

While the phrase "serious bodily injury" . . . is not susceptible to precise legal definition, it must describe an injury of a greater and more serious character than that involved in a simple assault. The distinction between

-12-

"bodily injury" and "serious bodily injury" is generally a question of fact for the jury and not one of law.

State v. Barnes, 954 S.W.2d 760, 765-66 (Tenn. Crim. App. 1997).

In State v. Farmer, our supreme court discussed the necessary proof for establishing serious bodily injury. 380 S.W.3d 96 (Tenn. 2012). The victim in Farmer suffered a gunshot wound to the leg while fleeing the scene of a robbery. Id. at 99. The evidence at the trial established that the victim did not know immediately that he had been shot and discovered the gunshot wound after fleeing and noticing a hole in his pants. Id. at 101. The victim described the gunshot wound as "a straight shot, you know, just tore straight through" and said he initially did not feel any pain because of the adrenaline. Id. At the hospital, a doctor cleaned the wound and took x-rays but did not stitch it, and he was discharged "within an hour or so" with pain medication. Id. The victim's hospital records indicated that he described his pain as mild to moderate. Id. The victim had no complications, and the injury had healed fully by the time of the trial. Id.

The Farmer court concluded that the evidence did not support a finding that the victim suffered serious bodily injury. In so holding, our supreme court reasoned as follows:

> . . . Factor (C) was not shown because there was no proof that [the victim] suffered extreme physical pain. Admitting to the difficulty of quantifying physical pain in State v. Sims, 909 S.W.2d 46, 49 (Tenn. Crim. App. 1995)[,] our Court of Criminal Appeals applied the *ejusdem generis* canon of statutory construction, stating that "the enumerated portions of the definition of serious bodily injury should be read as coming from the same class of injuries." The Sims court concluded that the pain associated with the injury suffered by the victim in that case—a broken nose—is not extreme enough to be included in a class of injury that involves a substantial risk of death, protracted unconsciousness, permanent disfigurement or protracted loss, or substantial impairment of a function of a bodily member, organ, or mental faculty. Likewise, in the instant case, the evidence does not support a finding that [the victim's] injury involved a degree of pain that would warrant its inclusion among the other enumerated portions of the definition of "serious bodily injury." . . . This brings us to the remaining factor, factor (A), which provides that a bodily "injury that involves . . . a substantial risk of death" also qualifies as a serious bodily injury. Tenn. Code Ann. § 39-11-106(a)(34).
>
> The Court of Criminal Appeals in a two-to-one decision ruled that the State presented evidence that would allow a rational jury to find that

-13-

[the victim's] injury involved a substantial risk of death, reasoning that although there was no actual serious bodily injury, the bullet

> could easily have punctured or severed the victim's femoral artery or vein, causing the victim to bleed to death. The fact that the bullet somehow traveled entirely through the victim's thigh while missing all of the vital blood vessels contained therein is a serendipitous turn of events for the victim, not the defendants.

[State v. Michael] Farmer [and Anthony Clark], [Nos. W2009-02281-CCA-R3-CD, W2009-02283-CCA-R3-CD,] 2011 WL 2672008, at *5 [(Tenn. Crim. App. July 8, 2011), vacated in part, 380 S.W.3d 96 (Tenn. 2012)].

> We respectfully disagree with this analysis. The statute provides that a serious bodily injury is an "injury that involves . . . substantial risk of death." Tenn. Code Ann. § 39-11-106(a)(34)(A) (emphasis added). By the plain meaning of this language, we hold that in determining whether there was a "serious bodily injury" based on a "substantial risk of death," we must look to the injury that occurred rather than the injury that could have occurred or the manner in which it occurred.

380 S.W.3d at 101-102 (footnote omitted).

In Sims, mentioned in the Farmer decision, the victim was struck in the face one time with a pistol. 909 S.W.2d at 48. As a result, she had a broken and swollen nose, a bruised cheekbone, two black eyes, and a cut across the bridge of her nose. Id. She testified that she experienced extreme physical pain on her face and nose. Id. During a hospital visit that lasted approximately two hours, a doctor treated the victim with a surgical band-aid to close the laceration, and she was not prescribed pain medication. Id. at 49. The victim also testified that she consulted a plastic surgeon about the cut on her face, but she did not undergo plastic surgery. Id. at 48. She missed five weeks of work because of her injuries. Id. We concluded that the evidence was insufficient to support the element of serious bodily injury based on extreme physical pain or protracted or obvious disfigurement. Id. at 49-50.

Recently, in State v. Martavious D. Brooks and Brittany G. Lee, this court addressed a factual scenario where the victim suffered similar injuries as the Sims' victim, but the panel reached a different conclusion. See No. M2017-00505-CCA-R3-CD, 2018 WL 3108882 (Tenn. Crim. App. June 25, 2018), perm. app. filed (Tenn. Aug. 23, 2018). The ninety-year-old victim in Brooks lived in an assisted living facility when someone came into her room, repeatedly struck her in the face, smothered her with a

-14-

pillow, and ripped her diamond ring off of her finger. 2018 WL 3108882, at *1-9. The victim was on multiple medications, including blood thinners, for multiple ailments at that time. This court determined that the victim's injuries, which included facial bruising, swelling, a fracture of the orbital bone, and intracranial bleeding, involved a substantial risk of death, extreme physical pain, and protracted or obvious disfigurement. In so holding, the Brooks panel reasoned as follows:

> The treating physician testified that the victim suffered a fracture to her orbital floor and her orbital bone was depressed almost a centimeter.
>
> We conclude that this disfigurement constitutes an obvious disfigurement within the meaning of the statute. There was also sufficient evidence of the victim['s] being in extreme physical pain. The victim, elderly, and bleeding from her face called for help and expressed her pain at the time of the attack. The treating physician testified that the victim was "very bruised," had "a lot of facial trauma," and was "very uncomfortable and in pain." The repeated blows to the victim's face clearly caused her extreme physical pain.
>
> We also conclude that a reasonable jury could have found that the victim's injuries here involved a substantial risk of death. The victim was on multiple medications at the time of the assault, including two medications that thinned her blood to prevent blood clotting. Following the assault, the victim's doctor admitted her into the hospital to monitor for intracranial bleeding, which the doctor testified was a possibility given the victim's medical history and age. Her doctor also admitted the victim into the hospital to repeat a CT scan to check for delayed brain bleeding, a potentially fatal condition.
>
> . . . As a result of her injuries, the treating physician admitted the victim into the hospital because the physician feared that the victim might suffer a fatal injury as a result of delayed brain bleeding. The physical injury to the victim's eye, which included a fracture of the orbital bone, involved a substantial risk of death from cranial bleeding.

Id. at *12-13. The panel in Brooks differentiated the facts from those presented in Farmer and Sims, reasoning as follows:

> In both Sims and Farmer the victims were treated at the hospital briefly and then released. In both Sims and Farmer the victims were relatively young and otherwise healthy. In both of those cases a doctor did not testify that the victims were admitted to be monitored for a potentially

fatal resulting injury. We distinguish the injuries of the <u>Sims</u> and <u>Farmer</u> victims from the injuries to the victim in this case and conclude that a reasonable jury could have found that the victim's injuries here involved a substantial risk of death from cranial bleeding.

<u>Id.</u> at *13.

We now turn to our analysis of the various subsections defining serious bodily injury provided in Tennessee Code Annotated section 39-11-106(a)(34). Subsection F, involving a broken bone of a child, is clearly not applicable because the victim was over twelve years of age.

Relative to whether the injury involved a substantial risk of death (subsection A), our supreme court in <u>Farmer</u> stated that, "in many cases[,] a layperson does not have the necessary medical knowledge to determine whether a particular injury involves a substantial risk of death" and that "expert medical testimony is frequently of critical importance in establishing that fact." 380 S.W.3d at 102. Although the victim stated that he was taking "blood thinners," no medical professional testified that the victim's injuries involved a substantial risk of death, and the medical records do not reflect that the victim was in danger of dying. Moreover, this is not a case "in which a juror's 'common-sense understanding'" would have been sufficient to determine whether the victim's injury involved a substantial risk of death. <u>Id.</u> at 104 (Koch, J., concurring) (footnote omitted) (noting that expert testimony is often helpful "except for injuries that are either so serious or so trivial that a lay person will understand that they either do or do not involve a substantial risk of death"). Neither a broken nose nor surgery to repair that break inherently, without more, involve a substantial risk of death.

Regarding any protracted unconsciousness (subsection B), the victim testified that he never lost consciousness following the attack, much less suffered from protracted unconsciousness. The medical records do not indicate that the victim was unconscious except during surgery.

Relative to whether the victim suffered a protracted loss or substantial impairment of a function of a bodily member, organ, or mental faculty (subsection E), the victim was asked if his "hearing [had] been affected as a consequence of" the Defendant's actions, and the victim responded that his hearing had "really changed." However, there was evidence that the Defendant had a hearing impairment prior to the incident and wore a hearing aid. The Defendant did not elaborate regarding how his hearing had "changed" or been further impaired due to the beating. Accordingly, subsections (A), (B), (E), and (F) are not satisfied.

-16-

Turning to subsections (C), extreme physical pain, and (D) protracted or obvious disfigurement, we note that the victim here was seventy-one years old at the time of the attack and was required to stay in the hospital for three days following the incident. The victim testified that the Defendant "smashed [him] up side his face" and that "blood just flew." The victim's nose was broken. His eye was cut open. His "ear was all cut." His hearing aid was driven into his ear from the beating. He required stitches. The victim described that, as a result of the attack, he was in physical pain and "hurting bad." The victim further averred, "I knew I had to get some place to get the bleeding to stop because I take blood thinners from my doctor." Although the victim testified that he did not lose consciousness, he said that he was "really dazed" and almost passed out. The jury was also able to view the photographs of the victim's injuries.

Officer Love testified that he arrived at the gas station and spoke with the victim. According to Officer Love, the victim "had blood all over his face," was "a little disheveled," and "was complaining of his injuries." Officer Love called for an ambulance.

The Defendant asserts that the victim's medical records "indicate[d] that the pain was mild or none at all." However, the medical records reflected that the victim described his pain upon admission to the hospital as an eight out of ten and that he was unable to sign admission documents due to his medical condition. Upon admission, it was noted, "Pain began suddenly. Is continuous[ly] [c]omplain[ing] of pain in left side of forehead, left eye, left zygomatic area, right temporal area and right side of forehead[.]" The victim also described his pain as "aching [and] throbbing" and was "[n]oted to be grimacing." Moreover, the victim's pain did not decrease until he was given morphine intravenously, and he was administered additional pain medication in the days that followed. The victim's medical records indicated that he reported "acute pain" on several occasions during his hospital stay. Moreover, his broken nose required surgery to repair. Finally, the victim said at trial that, at times, he still suffered from pain in his face where he was hit. This is more than merely "pain commonly associated with a broken nose." See Sims, 909 S.W.2d at 48.

We find ourselves faced with a set of facts more akin to those presented in Brooks and distinguishable from Sims and Farmer. Accordingly, we conclude that a rational juror could have found beyond a reasonable doubt that the Defendant caused injuries to the victim that resulted in the victim's experiencing extreme physical pain and suffering protracted or obvious disfigurement. Thus, the evidence was sufficient to establish serious bodily injury pursuant to both subsections (C) and (D) of Tennessee Code Annotated 39-11-106(a)(34).

C. Accompanying Felony. The Defendant submits that any removal or confinement of the victim was incidental to the taking of the automobile and that,

therefore, there was insufficient evidence of a separate and distinct kidnapping. The State notes that the Defendant was convicted of attempted especially aggravated robbery and asserts that "the evidence presented at trial . . . was more than sufficient to allow the jury to find that the [D]efendant intended to and took a substantial step towards driving off with [the victim] in addition to [taking] his vehicle and property."

Tennessee courts have long recognized that a conviction for kidnapping that accompanies another felony may not stand if the kidnapping is essentially incidental to the other felony. See State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991). In State v. White, the Tennessee Supreme Court concluded that the legislature intended "to punish as kidnapping only those instances in which the removal or confinement has criminal significance above and beyond that necessary to consummate some underlying offense, such as robbery or rape." 362 S.W.3d 559, 577 (Tenn. 2012). Accordingly, the court held that whether the evidence is sufficient to support every element of kidnapping is a jury question. Id.

The White court replaced the prior due process test articulated in Anthony with a sufficiency analysis. 362 S.W.3d at 578. The White court determined that "trial courts must ensure that juries return kidnapping convictions only in those instances in which the victim's removal or confinement exceeds that which is necessary to accomplish the accompanying felony." Id. Put another way, "trial courts should specifically require a determination of whether the removal or confinement is, in essence, incidental to the accompanying felony or, in the alternative, is significant enough, standing alone, to support a conviction." Id. In order to provide guidance to trial courts, our supreme court set forth the following instruction for courts to use when instructing on kidnapping offenses:

> To establish whether the defendant's removal or confinement of the victim constituted a substantial interference with his or her liberty, the State must prove that the removal or confinement was to a greater degree than that necessary to commit the offense of [insert offense], which is the other offense charged in this case. In making this determination, you may consider all the relevant facts and circumstances of this case, including, but not limited to, the following factors:
>
> • the nature and duration of the victim's removal or confinement by the defendant;
>
> • whether the removal or confinement occurred during the commission of the separate offense;

-18-

• whether the interference with the victim's liberty was inherent in the nature of the separate offense;

• whether the removal or confinement prevented the victim from summoning assistance, although the defendant need not have succeeded in preventing the victim from doing so;

• whether the removal or confinement reduced the defendant's risk of detection, although the defendant need not have succeeded in this objective; and

• whether the removal or confinement created a significant danger or increased the victim's risk of harm independent of that posed by the separate offense.

362 S.W.3d at 580-81.

In this case, the Defendant does not dispute that the jury was properly instructed according to the pattern instruction adopted after White. Nevertheless, the Defendant contends that the jury erred by finding sufficient proof to satisfy a conviction for attempted especially aggravated kidnapping independent of his conviction for especially aggravated robbery. We disagree.

Viewed in the light most favorable to the State, the proof at trial showed that the Defendant ordered the victim to "scoot over" at gunpoint and said, "I'll shoot you. I mean it. I mean it." The victim said that he complied because he knew the Defendant "meant business." The Defendant began driving away with the victim in the car in an attempt to flee, prevent the victim from summoning for help, and avoid detection. While the victim managed to free himself from the vehicle fairly quickly, he was only able to do so after fighting with the Defendant and securing the weapon. Certainly holding the victim at gunpoint and the struggle that took place inside the automobile created a significant danger and increased the victim's risk of harm. Once the victim threw the weapon out of the passenger-side window, the Defendant got out to retrieve the handgun, and the victim, despite his injuries, was able to exit the vehicle and head towards the gas station. The video corroborated the victim's version of events. The Defendant could have stolen the automobile without keeping the victim inside at gunpoint; accordingly, the Defendant's entire course of action was corroborative of his intent to commit kidnapping. See Tenn. Code Ann. § 39-12-101(b). Because the Defendant's conduct constituted a substantial step towards driving off with the victim in addition to taking the automobile, we conclude that the evidence was sufficient to establish that the attempted kidnapping was distinct from the robbery.

-19-

D. Identity.  Finally, the Defendant claims that there was insufficient proof establishing his identity as the person who set fire to the victim's vehicle because no one was "able to say who set it on fire."  The State counters that, "although there was no direct testimony that the [D]efendant burned the truck," there was sufficient circumstantial evidence for a reasonable juror to infer that the Defendant was the individual who set fire to the vehicle.

"The identity of the perpetrator is an essential element of any crime."  State v Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (citing State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975)).  The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt.  State v. Cribbs, 967 S.W.2d 773, 779 (Tenn. 1998).  Identity may be established by direct evidence, circumstantial evidence, or a combination of the two.  Thompson, 519 S.W.2d at 793.  The identification of the defendant as the perpetrator is a question of fact for the jury after considering all the relevant proof.  State v. Thomas, 158 S.W.3d 361, 388 (Tenn. 2005) (citing State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993)).

Officer Love testified that he responded to the gas station at approximately 7:10 a.m. on the morning of November 4, 2015, after receiving a report of a carjacking.  After the ambulance took the victim away, Officer Love left the gas station and proceeded to travel two blocks away where he found that the victim's automobile had been set on fire.  Officer Payment testified that he responded to an arson call of a vehicle on fire at approximately 7:15 a.m.  When Officer Payment arrived on the scene, he saw that the automobile had been "completely burnt," and he smelled the odor of an accelerant.

In addition, the victim was able to observe the Defendant for a significant amount of time before the robbery conversing with him for several minutes both inside and outside the gas station.  The victim consistently identified the Defendant as the perpetrator, and the surveillance video, which captured multiple angles of the incident, was played from the jury.  In addition, the victim's belongings were discovered underneath the staircase outside of the apartment where the Defendant was living, and the victim's blood was found on the Defendant's jacket that he wore when he committed the robbery.

The vehicle was found less than two miles away from the gas station and within minutes of the robbery.  The jury could reasonably deduce that the Defendant burned the vehicle in an effort to secret evidence.  We agree with the State that the Defendant's identity was shown by sufficient circumstantial evidence.

## II. Alleged <u>Ferguson</u> Violation

The Defendant claims that the trial court erred in denying his motion to dismiss based upon the State's alleged failure to preserve evidence in violation of the due process standards set forth in <u>State v. Ferguson</u>, 2 S.W.3d at 915-16. Specifically, the Defendant maintains that the State failed to preserve a second photographic lineup labeled "A" in which the victim identified the individual in "A3" and a single photograph on an iPad shown to the victim while he was in the hospital. The Defendant submits that the evidence was discoverable under Tennessee Rule of Criminal Procedure 16; that "at least ordinary negligence [was] involved"; that "[t]he significance of the evidence [was] obvious" because it would "bring [the victim's] identification of the [D]efendant into question"; and "[t]he significance of the other evidence used at trial . . . [was] insufficient without the identification." Alternatively, the Defendant argues that the trial court erred by declining to impose sanctions and give to the jury Tennessee Pattern Jury Instruction 42.23[4] regarding the State's duty to preserve evidence. The State responds that the trial court correctly ruled that it did not have a duty to preserve the evidence and, even if it did, that the Defendant received a fair trial without the limiting instruction.

In <u>Ferguson</u>, our supreme court "explained that the loss or destruction of potentially exculpatory evidence may violate a defendant's right to a fair trial." <u>State v. Merriman</u>, 410 S.W.3d 779, 784 (Tenn. 2013) (citing <u>Ferguson</u>, 2 S.W.3d at 915-16). The court rejected a "bad faith" analysis in favor of "a balancing approach in which bad faith is but one of the factors to be considered in determining whether the lost or destroyed evidence will deprive a defendant of a fundamentally fair trial." <u>Id.</u> at 785. Our supreme court "observed that fundamental fairness, as an element of due process, requires a review of the entire record to evaluate the effect of the State's failure to preserve evidence." <u>Id.</u> at 784-85 (citing <u>Ferguson</u>, 2 S.W.3d at 914, 917).

---

[4] Tennessee Pattern Jury Instruction 42.23 provides as follows:

The State has a duty to gather, preserve, and produce at trial evidence which may possess exculpatory value. Such evidence must be of such a nature that the defendant would be unable to obtain comparable evidence through reasonably available means. The State has no duty to gather or indefinitely preserve evidence considered by a qualified person to have no exculpatory value, so that an as yet unknown defendant may later examine the evidence.

If, after considering all of the proof, you find that the State failed to gather or preserve evidence, the contents or qualities of which are an issue and the production of which would more probably than not be of benefit to the defendant, you may infer that the absent evidence would be favorable to the defendant.

Tenn. Prac. Pattern Jury Instr. T.P.I.--Crim. 42.23 (16th ed.).

To facilitate this "balancing approach," our supreme court ruled that the trial court must first "determine whether the State had a duty to preserve the evidence" and observed that the State's duty to preserve was "limited to constitutionally material evidence." Merriman, 410 S.W.3d at 785. The court held that to be "constitutionally material," the evidence "must potentially possess exculpatory value and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Id. (citing Ferguson, 2 S.W.3d at 915, 918). "If the trial court determines that the State had a duty to preserve the evidence, the court must determine if the State failed in its duty." Id. (citing Ferguson, 2 S.W.3d at 917). If the trial court concludes that the State lost or destroyed evidence that it had a duty to preserve, the trial court must then consider three factors to determine the appropriate remedy for the State's failure: "(1) [t]he degree of negligence involved; (2) [t]he significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and (3) [t]he sufficiency of the other evidence used at trial to support the conviction." Id. (quoting Ferguson, 2 S.W.3d at 917). "If the trial court concludes that a trial would be fundamentally unfair without the missing evidence, the trial court may then impose an appropriate remedy to protect the defendant's right to a fair trial, including, but not limited to, dismissing the charges or providing a jury instruction." Id. at 785-86.

Here, the trial court denied the Defendant's motion to dismiss or request for sanctions, which included the Defendant's request for a jury instruction on the State's duty to preserve evidence. In concluding that the State was under no duty to preserve a second lineup, the trial court determined (1) "that there ha[d] been no showing that there was ever any photographic lineup shown to the alleged victim other than the one produced at the hearing"; (2) "that there was only the original lineup shown"; (3) "that the number 3 in the victim's statement was typographical error"; and (4) "that no second lineup ever existed." Regarding the iPad photograph, the trial court likewise determined that the State was under no duty to preserve such evidence, reasoning that (1) "there ha[d] been no showing that the photograph possessed exculpatory value"; and (2) "[i]t did not affect the identification procedure, as it occurred after the photo lineup was shown." A trial court's application of the Ferguson factors involves a constitutional issue, and therefore, the proper standard of review on appeal concerning the fundamental fairness of a trial is de novo with no presumption of correctness. Merriman, 410 S.W.3d at 791, 797.

The trial court concluded that Ferguson was not applicable because the second photographic lineup did not exist. In State v. Randall S. Sparks, this court held that the State had no duty to preserve recordings of drug transactions because the recordings did not exist. No. M2005-02436-CCA-R3-CD, 2006 WL 2242236, at *5 (Tenn. Crim. App. Aug. 4, 2006). The Sparks court reasoned, "[W]e can find no case law in this state that indicates Ferguson applies to evidence that never existed. On the contrary, this court

-22-

has repeatedly refused to grant <u>Ferguson</u> relief when there was no proof that the alleged evidence existed." <u>Id.</u> (citing <u>State v. Timothy D. Prince</u>, No. M2004-01262-CCA-R3-CD, 2005 WL 1025774, at *4 (Tenn. Crim. App. May 3, 2005); <u>State v. Linda H. Overholt</u>, No. E2003-01881-CCA-R3-CD, 2005 WL 123483, at *6 (Tenn. Crim. App. Jan. 21, 2005); <u>State v. George R. Croft</u>, No. W2001-00134-CCA-R3-CD, 2002 WL 31625047, at *6-7 (Tenn. Crim. App. Nov. 20, 2002)). <u>See also</u> <u>State v. Kenneth Clay Davis</u>, No. E2006-01459-CCA-R3-CD, 2007 WL 1259206, at *4 (Tenn. Crim. App. Apr. 30, 2007) (holding, with regard to the absence of a recording of the traffic stop, that the "State cannot destroy evidence that does not exist"); <u>John Darryl Williams-Bey v. State</u>, No. M2005-00709-CCA-R3-PC, 2006 WL 2242263, at *7 (Tenn. Crim. App. Aug. 4, 2006) (affirming post-conviction court's finding that counsel was not ineffective for failing to seek non-existent fingerprint evidence or curative jury instruction therefor).

We agree with the trial court that the Defendant failed to prove that a second a lineup ever existed. All of the officers testified that only one photographic lineup was used in this case. The victim confirmed that he was only shown one lineup and that he never identified anyone in position three. Detective Leatherwood explained the "A3" reference in the victim's subsequent police statement as a typographical error. Detectives Byrd and Leatherwood also clarified that, because there was only one lineup used, it was by default "A" even though it was not officially labeled as such. Thus, the Defendant's <u>Ferguson</u> argument regarding the second photographic lineup is unavailing.

The existence of the iPad photograph is somewhat more troublesome, given that the victim stated he was shown such a picture despite all of the officers' testimony to the contrary. Even if the photograph existed, in order for the <u>Ferguson</u> rule to apply, the evidence must "possess an exculpatory value that was apparent before the evidence was destroyed." <u>Ferguson</u>, 2 S.W.3d at 917. The victim testified that he was shown a single photograph on an iPad by a detective named "Mike" about twenty minutes after completing the lineup with Detective Byrd. The victim confirmed that he identified the individual in the photographic lineup before being shown the photograph on the iPad. The trial court aptly noted that showing the victim this photograph "did not affect the identification procedure, as it occurred after the photo lineup was shown." We conclude that the State's duty to preserve the photograph did not attach because the evidence did not possess an exculpatory value that was apparent before it was lost or was destroyed.

Finally, "[a]s a general rule, . . . a trial lacks fundamental fairness where there are errors which call into question the reliability of the outcome." <u>Ferguson</u>, 2 S.W.3d at 914 n.3 (citing <u>Betts v. Brady</u>, 316 U.S. 455, 462 (1942); <u>Watkins v. State</u>, 393 S.W.2d 141, 144 (Tenn. 1965); <u>Lofton v. State</u>, 898 S.W.2d 246, 248 (Tenn. Crim. App. 1994)). As noted above, the victim was able to observe the Defendant for several minutes before the robbery because the two engaged in conversation. The victim consistently identified the

Defendant as the perpetrator, and the surveillance footage was played from the jury while the victim narrated. Moreover, the victim's belongings were discovered underneath the staircase outside of the apartment where the Defendant was living, and the victim's blood was found on the Defendant's jacket that he wore when he committed the robbery. The victim's automobile was found within minutes of the robbery "completely burnt." Even if we assumed for the sake of argument that the State had a duty to preserve the complained of evidence, the significance of the lost or destroyed evidence is slight, paling in comparison to the "other evidence used at trial to support the conviction." See Merriman, 410 S.W.3d at 785 (quoting Ferguson, 2 S.W.3d at 917). Thus, the trial court did not err by denying a due process remedy in the form of dismissing the indictment or issuing a jury instruction.

### III. Victim's Medical Records

The Defendant contends that the trial court erred when it admitted into evidence the victim's medical records because the affidavit certifying them was deficient. The affidavit, he contends, was admitted into the record in error because it was hearsay, and the affiant did not state therein "that the person providing the information had firsthand knowledge of the events or facts; that the person providing the information had a business duty to record or transmit the information; [and] that the business had a regular practice of making such documents[.]" According to the Defendant, "the manner in which the information was provided or the document was prepared" indicates a lack of trustworthiness. The Defendant further submits that the trial court erred by taking "judicial notice of the fact that Regional One Health is a hospital and that their business is treating people" because there is no evidence that these were "facts gained by personal knowledge." Moreover, the Defendant avers that these facts have "nothing to do with the manner in which records are kept by the hospital or the qualifications of the affiant." The State responds that the affidavit was properly admitted pursuant to Tennessee Rule of Evidence 902(11) because it can be reasonably inferred from the affidavit "that the individuals who created the records had knowledge of the events as well as a business duty to create the record"; that "the records were kept by the hospital during" the timeframe stated therein; and that "they were kept as a part of regularly conducted activity[.]" The State maintains that there has been substantial compliance with the Rule.

The Tennessee Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). "Hearsay [evidence] is not admissible except as provided by [the Tennessee Rules of Evidence] or otherwise by law." Tenn. R. Evid. 802. Tennessee Rules of Evidence 803 and 804 list the exceptions to this general rule of inadmissibility. One such exception is for business records. Tenn. R. Evid. 803(6).

-24-

Rule 803(6) defines the prerequisites for admission of business records as follows:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record or data compilation, all as shown by the testimony of the custodian or other qualified witness or by certification that complies with Rule 902(11) or a statute permitting certification, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, profession, occupation, and calling of every kind, whether or not conducted for profit.

"The foregoing exception 'rests on the premise that records regularly kept in the normal course of business are inherently trustworthy and reliable.'" Arias v. Duro Standard Products Co., 303 S.W.3d 256, 262 (Tenn. 2010) (quoting Alexander v. Inman, 903 S.W.2d 686, 700 (Tenn. Ct. App. 1995)). Tennessee Rule of Evidence 803(6) includes the following five criteria that must be satisfied for a document to be admissible under the business records exception:

1. The document must be made at or near the time of the event recorded;

2. The person providing the information in the document must have firsthand knowledge of the recorded events or facts;

3. The person providing the information in the document must be under a business duty to record or transmit the information;

4. The business involved must have a regular practice of making such documents; and

5. The manner in which the information was provided or the document was prepared must not indicate that the document lacks trustworthiness.

Arias, 303 S.W.3d at 263 (quoting Alexander, 903 S.W.2d at 700).

Moreover, Tennessee Rule of Evidence 902(11) eliminates the need to call the custodian of records as a trial witness. Tenn. R. Evid. 803(6), Advisory Comm'n Cmts. Rule 902(11) provides as follows:

-25-

The original or a duplicate of a domestic record of regularly conducted activity that would be admissible under Rule 803(6) if accompanied by an affidavit of its custodian or other qualified person certifying that the record—

(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of and a business duty to record or transmit those matters;

(B) was kept in the course of the regularly conducted activity; and

(C) was made by the regularly conducted activity as a regular practice.

A party intending to offer a record into evidence under this paragraph must provide written notice of that intention to all adverse parties, and must make the record and declaration available for inspection sufficiently in advance of their offer into evidence to provide an adverse party with a fair opportunity to challenge them.

"The standard of review for rulings on hearsay evidence has multiple layers." Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015). The "factual and credibility findings" made by the trial court when considering whether a statement is hearsay, "are binding on a reviewing court unless the evidence in the record preponderates against them." Id. (citing State v. Gilley, 297 S.W.3d 739, 759-61 (Tenn. Crim. App. 2008)). "Once the trial court has made its factual findings, the next questions—whether the facts prove that the statement (1) was hearsay and (2) fits under one the exceptions to the hearsay rule—are questions of law subject to de novo review." Id. at 479 (citations omitted).

On April 27, 2017, prior to trial, the State filed a notice of its intent to rely on certified copies of the victim's medical records at trial. The defense was clearly on notice that the State sought to introduce the victim's medical records as business records under Rule 803(6) and that the documents were intended to qualify as self-authenticating under Rule 902(11). In point of fact, the rule requires written notice. See Tenn. R. Evid. 902(11).

At trial, the defense objected to introduction of the victim's medical records, arguing that the custodian did not certify "that the record was kept in the course of regularly conducted activity" or that records contained therein were made by "a person with knowledge of and a business duty to record or transmit" those matters. Attached to

-26-

the victim's medical records was a March 9, 2017 affidavit from "Joanne Hunter, RHIA." In it, she certified the following:

> 1. That I am the duly authorized Custodian of the medical records of Regional One Health and have the authority to certify said medical records totaling 127 pages.
>
> 2. That the copy of the medical records of John Blose attached to the affidavit is a true copy of all the records described in the subpoena duces tecum, and
>
> 3. That the records were prepared by the personnel of Regional One Health, staff physicians, or person acting under the control or either in the ordinary course of hospital business at or near the time of the act, condition, or event reported therein.

Defense counsel acquiesced that that third statement of Ms. Hunter might permit an inference that the medical records were made by "a person with knowledge of and a business duty to record or transmit those matters." However, the defense continued to maintain that the requirement that the affidavit state that the record "was kept in the course of the regularly conducted activity" was absent. The trial court took judicial notice of the fact that Regional One Health was "a hospital, and their business [was] treating people in the hospital." The trial court then ruled that the records were admissible as an exception to the hearsay rule.

While the affidavit could certainly be more artfully drafted to comply with Rule 902(11), we must agree that the affidavit satisfies the Rule's requirements. Initially, we note that the affidavit itself uses the language "medical records" and "ordinary course of hospital business"; thus, there was no need for the trial court to take judicial notice of the fact that Regional One Health was a hospital in the business of treating people. Moreover, the third sentence of the affidavit provides that the victim's medical records were prepared by hospital personnel or staff physicians at or near the time of the occurrence of the matters set forth therein and that those individuals were acting under the control of the hospital or in the ordinary course of hospital business. It can be reasonably inferred from the affidavit that the individuals who created or prepared the records had knowledge of the events, as well as a business duty to create or transmit the record, and that the records were kept in the course of the regularly conducted activity of the hospital as a regular practice. This is sufficient to show that the documents were a business record, inherent of trustworthiness. See Alexander, 903 S.W.2d at 700. As such, we conclude that the victim's medical records were properly admitted under the business records exception pursuant to Rule 803(6) and that Ms. Hunter's sworn affidavit complied with Rule 902(11). The Defendant is not entitled to relief from this issue.

## IV. Flight Instruction

Finally, the Defendant argues that the trial court erred by giving the jury an instruction on flight where the proof did not support the instruction. The State insists that the facts at trial supported the instruction.

A defendant in a criminal case "has a right to a correct and complete charge of the law, so that each issue of fact raised by the evidence will be submitted to the jury on proper instructions." State v. Garrison, 40 S.W.3d 426, 432 (Tenn. 2000); see State v. Leath, 461 S.W.3d 73, 105 (Tenn. Crim. App. 2013). When reviewing jury instructions on appeal to determine whether they are erroneous, this court must "review the charge in its entirety and read it as a whole." State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997). A jury instruction is considered "prejudicially erroneous," only "if it fails to fairly submit the legal issues or if it misleads the jury as to the applicable law." Id. Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. Carpenter v. State, 126 S.W.3d 879, 892 (Tenn. 2004).

In the present case, the trial court provided the jury with the following jury instruction on flight:

> The flight of a person accused of a crime is a circumstance which, when considered with all the facts of the case, may justify an inference of guilt. Flight is the voluntary withdrawal of oneself for the purpose of evading arrest or prosecution for the crime charged. Whether the evidence presented proves beyond a reasonable doubt that the Defendant fled is a question for your determination.
>
> The law makes no precise distinction as to the manner or method of flight; it may be open, or it may be a hurried or concealed departure, or it may be a concealment within the jurisdiction. However, it takes both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community, or a leaving the community for parts unknown, to constitute flight.
>
> If flight is proved, the fact of flight alone does not allow you to find that the [D]efendant is guilty of the crime alleged. However, since flight by a [d]efendant may be caused by a consciousness of guilt, you may consider the fact of flight, if flight is so proven, together with all the other evidence when you decide the guilt or innocence of the [D]efendant. On the other hand, an entirely innocent person may take flight and such flight may be explained by proof offered, or by the facts and circumstances of the case.

-28-

Whether there was flight by the Defendant, the reasons for it, and the weight to be given to it, are questions for you to determine.

See Tenn. Prac. Pattern Jury Instr. T.P.I.--Crim. 42.18 (16th ed.).

"In order for a trial court to charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction." State v. Berry, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence exists supporting a jury instruction on flight where there is evidence of both a leaving the scene of the crime and subsequently hiding in the community. State v. Burns, 979 S.W.2d 276, 289-90 (Tenn. 1998) (quoting State v. Payton, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989)). The State may satisfy the subsequent hiding requirement by presenting proof from which a jury might infer that the defendant committed this act. State v. Terrance Wilks, No. W1999-00279-CCA-R3-CD, 1999 WL 1097832, at *4 (Tenn. Crim. App. Nov. 22, 1999). Even a brief evasion of authorities can support the giving of the flight instruction. Payton, 782 S.W.2d at 498.

The Defendant argues that there was insufficient evidence that he "hid or concealed himself from the police, or that he left the community in order to evade the police." He notes that he was apprehended near his girlfriend's apartment where he was living and that the location of the burnt vehicle, the gas station, and the apartment are "within walking distance of one another." However, no specific distance is required. The victim testified that the Defendant drove away in his automobile and that he did not give the Defendant permission to do so. The surveillance video showed the Defendant's driving away from the gas station. The Defendant set fire to the victim's vehicle within minutes of leaving the scene. The Defendant was only apprehended several hours later following a "Crime Stoppers tip." In this case, there is ample evidence that the Defendant left the scene after stealing the victim's vehicle and that he subsequently hid out in the community to evade arrest. We conclude that the trial court properly instructed the jury as to flight.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE